# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 23-724 c/w 23-725

MONA LEBLANC

VERSUS

WALMART STORES, INC. AND
CLAIMS MANAGEMENT, INC.

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION #4
PARISH OF LAFAYETTE, No. 10-11529 c/w 13-05970
ANTHONY PALERMO, WORKERS' COMPENSATION JUDGE

**********

## JONATHAN W. PERRY
## JUDGE

**********

Court composed of Shannon J. Gremillion, Jonathan W. Perry, and Sharon Darville Wilson, Judges.

**AFFIRMED IN PART; REVERSED IN PART;
REMANDED WITH INSTRUCTIONS;
AND JUDGMENT RENDERED.**

Keith J. Landry
Parker & Landry
201 Johnson Street, Suite 200
Alexandria, Louisiana 71301
(337) 362-2600
**COUNSEL FOR DEFENDANT/APPELLEE:**
   Walmart Stores, Inc.

Jacqueline K. Becker
Galloway Jefcoat, L.L.P.
P.O. Box 61550
Lafayette, Louisiana 70596-1550
(337) 984-8020
**COUNSEL FOR CLAIMANT/APPELLANT:**
   Mona LeBlanc

**PERRY, Judge.**

In this workers' compensation case, Mona LeBlanc ("Ms. LeBlanc") appeals the judgment of the Workers' Compensation Judge ("WCJ") which granted the motion of Walmart Stores, Inc. ("Walmart")[1] to modify her disability status, finding she was capable of gainful employment in a sedentary capacity, rejecting her contention that her stiff person syndrome ("SPS") was related to her work accident, and denying her claims for penalties and attorney fees. We affirm in part, reverse in part, render, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

The facts of this case have their beginning in Ms. LeBlanc's work accident at Walmart on November 2, 2010, and her claim for temporary total disability benefits ("TTDs"). Walmart contested Ms. LeBlanc's workers' compensation claim. After hearing evidence on October 7, 2012, the WCJ orally ruled in favor of Ms. LeBlanc on August 5, 2013. However, a signed judgment was not forthcoming until February 19, 2015.[2] Following that determination, Walmart appealed that judgment. In an opinion that affirmed the WCJ judgment, this court stated:

> The parties stipulated that the November 2, 2010 accident, wherein Ms. LeBlanc was checking the seal on an eighteen wheeler when the truck suddenly backed up striking the left side of her body and her left knee, occurred in the course and scope of her employment with Wal-Mart. Ms. LeBlanc filed a disputed claim for compensation on December 15, 2010, alleging she was entitled to both TTD benefits and medical benefits, in addition to penalties and attorney fees. At the trial held on October 17, 2011, the main issue before the WCJ was the

---

[1] The record shows the defendant as Walmart Stores, Inc. and Claims Management, Inc. Initially, this matter was consolidated on April 1, 2014, in the trial court with *Lafayette Consolidated Government v. Claims Management, Inc. and Walmart Distribution Center*, an action in which the plaintiff sought reimbursements for medical bills it paid on behalf of Ms. LeBlanc, one of its retirees. On July 14, 2021, Lafayette Consolidated Government voluntarily dismissed its reimbursement claims as well as its intervention. Nonetheless, because judgments were signed in this matter and the consolidated matter and Ms. LeBlanc appealed both judgments, we will render a separate decision in No. 23-725, *Lafayette Consolidated Government v. Claims Management, Inc. and Walmart Distribution Center*.

[2] No explanation for this lengthy delay is contained in either the record or in the briefs filed in this matter.

causal link between the accident and Ms. LeBlanc's claimed injuries to her neck and back, and, if linked, Wal–Mart's responsibility to pay TTD benefits, the amount of those benefits, unpaid medical costs, penalties, and attorney fees.

. . . .

The WCJ found Ms. LeBlanc suffered a disability based on the causal connection between the accident and her claimed injuries to her neck and back largely due to its determination that Ms. LeBlanc was credible. The WCJ stated, "[T]his was pretty much a straightforward credibility decision." The WCJ further stated:

> "I thought Ms. LeBlanc was very credible. She appeared to be stiff. She appeared to be in pain. She answered all of her questions as directly as possible. She did not try to avoid any questions or dance around the issues. She was a police officer for twenty years. She was a good employee. She worked hard and she had no prior injuries. The only thing"—and this is still my handwritten note. "The only thing out of whack, so to speak, is that her complaints were all over the place." And that was problematic. However, I believe her and I believe her complaints regardless of how odd they might have been and how discombobulated the reporting of the complaints might have been.

> . . . .

> There was an immediate mention of back pain the first time she saw the doctor, but then there wasn't another complaint of back pain for a long time. Then, I believe Mr. Landry sets out seven months for the first cervical complaint, but early on she was having numbness and tingling in her hands, and she pretty much consistently had problems with the shoulder, any of which could have been neck problems that weren't previously or at that time diagnosed.... I do find that she has proven by a preponderance the connexity of those complaints. There's really nothing else to explain it. I think it's as simple as that.

To summarize, the WCJ indicated that this case and the finding of causation was "ultimately a credibility determination. There's no other explanation for her problems." We agree.

*LeBlanc v. Wal-Mart Stores, Inc.*, 15-558, pp. 1, 11–12 (La.App. 3 Cir. 11/4/15), 177 So.3d 1125, 1127–28, 1133.

2

On October 14, 2015, just weeks before this court affirmed the WCJ judgment, Walmart filed a motion in the Office of Workers' Compensation to modify Ms. LeBlanc's disability status, contending that she had reached maximum medical improvement ("MMI") and that she could return to sedentary work. Walmart's motion was based on the second medical opinions from Drs. John Budden ("Dr. Budden"), an orthopedic surgeon, and Seth Billodeaux ("Dr. Billodeaux"), a pain management physician, conducted on May 19, 2015, and June 17, 2015, respectively, as well as an independent medical examination ("IME") performed by Dr. Thad Broussard ("Dr. Broussard"), an orthopedic surgery specialist, on September 15, 2015. Contrary to that, Dr. Michael E. Heard ("Dr. Heard"), Ms. LeBlanc's treating orthopedist, opined on August 13, 2016, that she was not at MMI, and she was unable to work.

Subsequently, on November 9, 2015, Dr. James Domingue ("Dr. Domingue"), Ms. LeBlanc's treating neurologist, diagnosed Ms. LeBlanc with SPS after blood tests showed positive GAD65 antibodies, the litmus test for SPS. After Ms. LeBlanc fell at home and underwent left hip replacement surgery on January 11, 2016, she was examined after she recovered from her hip surgery by Dr. Joseph Jankovic ("Dr. Jankovic"), a board certified neurologist specializing in movement disorders at the Baylor College of Medicine, for a second medical opinion regarding Dr. Domingue's SPS diagnosis. Once Dr. Jankovic reviewed Ms. LeBlanc's medical history, her history of high GAD65 antibodies, and completed his physical examination, he agreed with Dr. Domingue's SPS diagnosis. Dr. Jankovic also opined that SPS is suggestive of the presence of an underlying autoimmune process.

Once Dr. Heard learned of Ms. LeBlanc's SPS diagnosis, he wrote a letter to her trial counsel on January 10, 2017. At that time, Dr. Heard opined that the trauma of the 2010 work accident and anxiety after Walmart delayed approval of her

3

medical treatment probably precipitated the onset of her SPS. To the contrary, Dr. Brobson Lutz ("Dr. Lutz"), a specialist in internal medicine and infectious disease relied upon by Walmart, opined that SPS is an autoimmune disease that was not caused or triggered by the work accident.

On January 23, 2018, Ms. LeBlanc underwent a Functional Capacity Evaluation ("FCE") at Rosewood Rehabilitation, LLC. After undergoing a five-hour evaluation, the evaluator determined that Ms. LeBlanc, who relied upon a walker to get around and who could not complete all the tests, demonstrated she was able to perform sedentary work with the following specifications: avoidance of lifting from floor height, carrying, crouching, kneeling, and stair climbing. Additionally, the FCE concluded that Ms. LeBlanc could occasionally walk, stand, and lift five pounds from the waist to shoulder height.

Subsequently, on March 24, 2021, Ms. LeBlanc filed a motion to modify the judgment of February 19, 2015, which awarded her temporary, total disability benefits. Relying on the opinion of Dr. Heard, her treating orthopedic physician, she contended that her "physical condition had worsened and deteriorated to the point that she is permanently incapable of performing any employment."

Trial before the WCJ[3] began on May 12, 2022, continued on July 25, 2022, and concluded on September 15, 2022. After taking the matter under advisement, the WCJ provided an oral ruling on April 25, 2023, and memorialized the ruling in a written judgment signed and rendered on April 28, 2023.

The judgment stated that: (1) Walmart's motion to modify was granted, terminating Ms. LeBlanc's temporary total disability benefits; (2) Ms. LeBlanc's

---

[3] The original trial on October 17, 2012, was held while Sharon Morrow ("Judge Morrow") served as WCJ. Later, after Judge Morrow retired, Anthony Palermo was appointed as successor judge on August 29, 2018, and he presided over this matter thereafter as WCJ.

4

SPS was not related to the accident in 2010; and (3) concluded that Ms. LeBlanc could engage in gainful employment in a sedentary capacity. With regard to Ms. LeBlanc's request for penalties and attorney fees, the judgment denied all those requests including those related to: the denial of Dr. Heard's billings in the amount of $7,880.00; the denial of treatment by Dr. Daniel Hodges ("Dr. Hodges"); the alleged failure to approve physical therapy; the failure to pay for Hydrocodone medication; the failure to pay Dr. Heard's medical bills for September 10, 2013, and October 9, 2013; the rejection of requests to pay the charges of Pharmacy Partners; the failure to approve treatment with Dr. Keith Mack; the failure to pay St. Thomas Clinic; and the failure to pay Lafayette Consolidated Government. The judgment further denied Ms. LeBlanc's claim for penalties and attorney fees for mileage reimbursement of December 12, 2014, and December 19, 2014, to attend physical therapy because those claims were covered by the prior judgment. Finally, the judgment denied Ms. LeBlanc's claims for penalties and attorney fees for: the visits of Ms. LeBlanc to Dr. Heard on December 14, 2016, and January 15, 2017; physical therapy; and failure to approve the FCE because each of these were related to the SPS treatment which was unrelated to the work accident.

Ms. LeBlanc then perfected the present appeal.

**ASSIGNMENTS OF ERROR**

1. The [WCJ] legally erred in not applying the legal presumption of causation and in finding Ms. LeBlanc's injuries and condition were not causally related to her work accident of November 2, 2010.

2. The [WCJ] erred in excluding from evidence Ms. LeBlanc's own testimony regarding her symptoms and condition prior to her accident of November 2, 2010 until the time of the [WCJ's] oral ruling of August 2013, after denying an exception of res judicata as to causation and determining causation was an issue for trial.

3. The [WCJ] erred in not giving greater weight to the opinion of Ms. LeBlanc's treating physicians and in relying upon the opinion of a second

5

medical opinion doctor, a specialist in the field of infectious diseases rather than neurology.

4. The [WCJ] legally erred in granting Wal-Mart's Motion to Modify Disability Status, in denying further indemnity benefits and in finding that Ms. LeBlanc is capable of gainful employment in a sedentary capacity.

5. The [WCJ] erred in not granting Ms. LeBlanc's Motion to Modify the Judgment and in not awarding permanent and total disability benefits.

6. The [WCJ] erred in failing to award payment of Dr. Heard's medical bills totaling $5,050.00.

7. The [WCJ] erred in denying Ms. LeBlanc's claims for penalties and attorney's fees, expenses, and legal interest on these awards.

## DISCUSSION

At the heart of the opposing motions to modify disability status filed by Ms. LeBlanc and Walmart is the question of her SPS diagnosis and its relationship to the work accident. Although Ms. LeBlanc has been examined by many doctors, four physicians specifically addressed the question of causation, namely, Dr. Heard, Dr. Domingue, Dr. Jankovic, and Dr. Lutz; the first three physicians treated Ms. LeBlanc and the remaining physician examined her at the request of Walmart for the sole purpose of obtaining an opinion on whether her SPS was causally related to the work accident. Because of this common thread and the parties' varying arguments relative to that diagnosis, we will first address this issue.

From the outset, however, we must first address two procedural questions. First, we observe that the WCJ's judgment does not reflect a specific rejection of Ms. LeBlanc's motion to increase her disability from temporary total to permanent and total disability because of her SPS diagnosis. Although the judgment is silent as to the WCJ's adverse determination of her motion, the transcript shows the WCJ rejected Ms. LeBlanc's claim when it found "that the Stiff Person Syndrome is not related to the accident, and that Walmart has proven by a preponderance of the evidence that [Ms. LeBlanc] is capable of working, at least, in the sedentary

6

capacity." Because of this determination in favor of Walmart, it is clear the WCJ never had to address Ms. LeBlanc's motion to increase her disability because of her SPS diagnosis.[4]

Second, Ms. LeBlanc takes issue with Walmart's motion to terminate her temporary total disability, particularly because it was filed before the original WCJ judgment was finalized by judgment in the appellate court.

Louisiana Revised Statutes 23:1310.8(A)(1) provides that the "jurisdiction of the workers' compensation judge over each case shall be continuing and he may, upon application by a party and after a contradictory hearing, make such modifications or changes with respect to former findings or orders relating thereto if, in his opinion, it may be justified[.]" In *Jeanise v. Cannon*, 04-1049, pp. 6–7 (La.App. 3 Cir. 2/23/05), 895 So.2d 651, 660, *writs denied*, 05-785 and 05-788 (La. 5/13/05), 902 So.2d 1021, we stated:

> Ordinarily, once a judgment becomes final and definitive, parties are bound by it regardless of a subsequent change in circumstances. Workers' compensation judgments, however, are treated differently from ordinary judgments. This is due to the fact that if the rules of finality applied to ordinary civil judgments are applied to workers' compensation judgments, the flexibility of the workers' compensation system would be greatly restricted. Where the legislature has expressly provided that an award or judgment can be subject to a claim of modification, res judicata does not apply. Under LSA–R.S. 23:1310.8, a compensation award may be modified by either party because of change in disability after an award has been made.
>
>> The modification statute is to be liberally construed in favor of the claimant, and that through it, the Legislature did not intend that a judgment determining the extent of a claimant's disability be res judicata, it having expressly provided that a compensation award can be subject to modification based on a change in the worker' condition. The power of modification, while not a substitute for the

---

[4] Regardless of the silence of the judgment in this respect, "it is well settled that when a trial court's judgment is silent with respect to a party's claim or an issue placed before the court, it is presumed that the trial court denied the relief sought." *Moore v. Moore*, 12-959, p. 4 (La.App. 3 Cir. 4/10/13), 116 So.3d 18, 22, *writ denied*, 13-1065 (La. 6/21/13), 118 So.3d 421.

> appellate process, exists for the purpose of modifying awards due to a change in the worker's condition. [*Jackson v. Iberia Par. Gov't,* 98–1810, p. 9 (La. 4/16/99), 732 So.2d 517, 524.]

> Within the entire scheme [of worker's compensation], the concept of modification is unique because it allows a case to be reopened and the award amended after the judgment becomes final. The purpose of the modification statute is to allow adjustments to be made after judgment "to insure that the employee will be paid compensation during the full period of his disability and that the employer will not be required to pay for any longer than this period of disability." Where the legislature has expressly provided that an award or judgment can be subject to a claim of modification, res judicata does not apply.

*Madere v. W.S. Life Ins. Co.,* 03–110, pp. 4–5 (La.App. 5 Cir. 4/29/03), 845 So.2d 1222, 1225 (footnotes omitted).

> The very nature of workers' compensation proceedings rarely allows the application of the res judicata principle. So long as the case is subject to being re-opened, the concept cannot apply. Only when the case has become final and no further proceedings are legally permissible will the concept be considered by our courts.

Considering that background, we find that Walmart's motion to modify was properly filed prior to our affirmation of the 2015 judgment. *See also Broussard v. Asco Venture Holdings*, 17-90, 17-91 (La.App. 3 Cir. 10/4/17), 229 So.3d 80 (holding that the legislature allowed for modifications by the WCJ to afford the needed flexibility to ensure that benefits correspond to changes in medical conditions and disability status). Furthermore, the record shows that the WCJ did not act on Walmart's motion until after this court affirmed the judgment of the WCJ and it became a final judgment.

*Stiff Person Syndrome*

It is undisputed that Dr. Domingue, Ms. LeBlanc's treating neurologist, diagnosed Ms. LeBlanc as having SPS on November 9, 2015. In an article published

8

by the National Organization for Rare Diseases at http:rarediseases.org/rare-diseases/stiff-person-syndrome/,[5] SPS is described and discussed, as follows:

> Stiff person syndrome (SPS) is a rare acquired neurological disorder that most often causes progressive muscle stiffness (rigidity) and repeated episodes of painful muscle spasms. Muscular rigidity often fluctuates (i.e., grows worse and then improves) and usually occurs along with the muscle spasms. Spasms may occur randomly or can be triggered by a variety of different events or circumstances including a sudden noise or light physical contact. The severity and progression of SPS varies from one person to another. If left untreated, SPS can potentially progress to cause difficulty walking and significantly impact a person's ability to perform routine, daily tasks. Although the exact cause of SPS is unknown, it is believed to be an autoimmune disorder and sometimes occurs along with other autoimmune disorders.

> . . . .

> The characteristic findings associated with SPS are progressive, fluctuating muscular rigidity that occurs along with muscle spasms. The severity and progression of SPS can vary from one person to another. The symptoms usually develop over a period of months to years and may remain stable for many years or slowly worsen. In some cases, symptoms can be stabilized.

> . . . .

> In many cases, SPS begins slowly over several months or a few years. Affected individuals may initially experience aching discomfort, stiffness, or pain, especially in the lower back or neck. Early on, stiffness may come and go, but it can gradually become fixed. The shoulders and hips may also be affected. As the disease progresses, stiffness of the leg muscles develops and is often more pronounced on one side than the other (asymmetrical). This leads to a slow, stiff manner of walking. As stiffness increases, affected individuals may develop a hunched or slouched posture due to outward curing of the spine (kyphosis) or an arched back due to inward curving of the spine (lordosis). In some individuals, stiffness may progress to involve the arms or face.

> In addition to muscular rigidity, individuals with SPS also develop muscle spasms, which may occur for no apparent reason (spontaneously) or in response to various triggering events (i.e.,

---

[5] This article was admitted into evidence as P-90. In his letter to Walmart on February 27, 2017, Dr. Lutz pointed out that when physicians are confronted with a rare disorder, it is common to refer to online databases. In this instance, Walmart did not object to the introduction of this item of evidence. We further note that this article was updated on July 11, 2023, and slightly differs from the printout entered into evidence. Nonetheless, we have quoted the document entered into evidence.

stimuli). Spasms can be triggered by unexpected or loud noises, minor physical contact, stress or situations that cause a heightened emotional response such anxiety-or fear-producing situations. Muscle spasms are often very painful and usually worsen existing stiffness. The spasms may involve the entire body or only a specific body region. The legs are often involved, which may lead to falls. Spasms of abdominal muscles may lead to individuals feeling full faster than normal (early satiety) and unintended weight loss.

. . . .

In some cases, SPS becomes severe enough to affect an individual's ability to perform daily activities and routines. Some individuals may need a walker or wheelchair. Some affected individuals experience uncontrollable anxiety when they need to cross large areas unassisted (agoraphobia) and become reluctant to go outside. If left untreated, SPS can potentially progress to cause significant disability or life-threatening complications such as respiratory compromise.

After reviewing the medical evidence, which will be more fully detailed later, the WCJ concluded that Ms. LeBlanc's SPS was an autoimmune disease that was not related to her work accident in 2010. Ms. LeBlanc takes issue with that conclusion and argues otherwise in this appeal.

## APPELLANT'S ARGUMENT

Ms. LeBlanc argues that although her SPS was undiagnosed for years after her work accident, her illness was there from the very beginning but had not manifested itself prior to the work accident, and her symptoms appeared shortly thereafter. She further argues that the record shows that immediately after her work accident, she suffered stiffness in her back, neck, shoulders, left side, and left knee. The WCJ at her initial trial found her credible and relied upon her testimony in finding that she proved her injuries were associated with her work accident. Although the WCJ could not explain how Ms. LeBlanc's complaints "were all over the place," it believed her. Ms. LeBlanc argues that it is evident that her full condition had not yet been diagnosed at that time, and that if her physicians had diagnosed her SPS from the beginning, the WCJ would have had an explanation for

the symptoms she exhibited. Thus, she concludes that the original WCJ could have ruled in her favor on more than just her credibility.

Ms. LeBlanc further argues that because her symptoms of SPS evidenced themselves shortly after the work accident and she had not manifested disabling symptoms of that illness prior to the work accident, she is entitled to a presumption that her SPS was causally related to the work accident. For this reason, Ms. LeBlanc argues that the WCJ legally erred when it disallowed her testimony to establish this legal presumption. Moreover, Ms. LeBlanc argues that the record shows that even if she did not have SPS at the time of her first trial, it developed and was triggered later due to her stress from her injuries and/or lack of treatment for her injuries and would still be causally related to the work accident. Simply stated, "but for" the stress on her body due to her injuries from the work accident and/or lack of treatment, SPS would not have been triggered. In support of her contention Ms. LeBlanc argues that the medical reports of Drs. Heard and Jankovic satisfy her duty to show that there was a reasonable possibility that this is what occurred. Those opinions coupled with her credibility and the testimony of her witnesses regarding her condition prior to and after the accident establish and prove causation.

**APPELLEE'S POSITION**

Walmart argues that even though three physicians agreed as early as 2015 that Ms. LeBlanc suffered SPS, those same three doctors found no support for her contention that the onset of this autoimmune disease was caused by the trauma of her work accident at Walmart. It contends that only Dr. Heard, Ms. LeBlanc's treating orthopedist, found she was permanently and totally disabled because of the SPS and opined that this disability was caused by "the physical trauma of the accident and the anxiety created by the nine-month denial of the evaluation of the other areas probably played a role in precipitation of the onset of SPS." It argues

11

that the WCJ was presented with differing testimony in this regard. Thus, it concludes that under these facts, there can be no manifest error when the WCJ chose to determine the case in favor of Walmart rather than Ms. LeBlanc.

## STANDARD OF REVIEW

Considering Ms. LeBlanc's argument, we must first determine the appropriate standard of appellate review. Even though Ms. LeBlanc acknowledges that the "[f]actual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review[,]" *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840, p. 7 (La. 7/1/97), 696 So.2d 551, 556, she contends that de novo review should be employed on appeal because the WCJ failed to apply the legal presumption of causation, a legal error.

In *Johnson v. Lofton Staffing Servs., Inc.*, 21-761, pp. 7–8 (La.App. 3 Cir. 5/4/22), 339 So.3d 663, 670, *writ denied*, 22-858 (La. 9/27/22), 347 So.3d 157, this court stated:

> This court, in *Lenox v. Central Louisiana Spokes, LLC*, 18-556, pp. 4-5 (La.App. 3 Cir. 2/13/19), 265 So.3d 834, quoted *Welborn v. Thompson Const.*, 15-1217, pp. 4–5 (La.App. 1 Cir. 2/26/16), 191 So.3d 1086, 1088–89 (emphasis in original), wherein our sister court stated the following:
>
> The workers' compensation laws provide coverage to an employee for personal injury received by accident arising out of and in the course of employment. LSA-R.S. 23:1031(A). An employee must prove the chain of causation required by the workers' compensation statutory scheme. He must establish that the accident was work-related, that the accident caused the injury, and that the injury caused the disability. *See DeGruy v. Pala, Inc.*, 525 So.2d 1124, 1130 (La.App. 1st Cir.), *writ denied*, 530 So.2d 568 (La.1988). Initially, a workers' compensation claimant has the burden of establishing by a preponderance of the evidence that an accident occurred on the job and that he sustained an injury. *Holiday v. Borden Chem.*, 508 So.2d 1381, 1383 (La.1987). Next, he must establish a causal connection between the accident and the resulting disability by a preponderance of the

12

evidence. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146, 1147 (La.1979). ***Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the fact finder based on all credible evidence****. DeGruy*, 525 So.2d at 1132.

Even if the employee suffered from a pre-existing medical condition, he may still meet his burden of proof of causation if he proves that the reported accident aggravated, accelerated, or combined with the pre-existing condition to produce a compensable disability. *Peveto v. WHC Contractors*, 93-1402 (La. 1/14/94), 630 So.2d 689, 691. He may be aided in meeting the foregoing burden by a presumption of causation, if he can prove that before the accident[,] he had not manifested disabling symptoms, that such symptoms commenced with the accident and manifested themselves thereafter, and that either medical or circumstantial evidence indicates a reasonable possibility of causal connection between the accident and onset of the disabling symptoms. *Walton v. Normandy Village Homes Ass'n, Inc.*, 475 So.2d 320, 324-25 (La.1985).

Although procedural rules are construed liberally in favor of workers' compensation claimants, the burden of proof, by a preponderance of the evidence, is not relaxed. Thus, the testimony as a whole must show that more probably than not an employment accident occurred and that it had a causal relation to the disability. If the testimony leaves the probabilities equally balanced, the plaintiff has failed to carry the burden of persuasion. Likewise, the plaintiff's case must fail if the evidence shows only a possibility of a causative accident or leaves it to speculation or conjecture. *Buxton v. Iowa Police Department*, 2009-0520 (La. 10/20/09), 23 So.3d 275, 283.

"[I]t is not necessary for the experts to determine the exact cause of the disability in order for the employee to recover." *Hammond v. Fidelity & Cas. Co. of New York,* 419 So.2d 829, 831 (La.1982). "Furthermore, medical testimony 'must be weighed in the light of other credible evidence of a nonmedical character, such as a sequence of symptoms or events in order to judicially determine probability' ..." *Schouest v. J. Ray McDermott & Co.*, 411 So.2d 1042, 1044-45 (La. 1982)." *Id.*

In the present case, the WCJ in the 2022 trial stated that the medical evidence entered at the 2012 trial included the medical complaints Ms. LeBlanc experienced because of her 2010 work accident that helped establish causation and could not be

readdressed by Ms. LeBlanc in this second trial. In justification for this ruling, the WCJ stated:

> But the only change after the [earlier] ruling is a new diagnosis. There wasn't another accident. We have the accident. We have the injury. We have the course and scope. We have a disability status. The only new thing is the diagnosis of Stiff Person Syndrome.
>
> The [earlier WCJ] already ruled that the accident and the symptoms were related. If the medical records say, Okay, look, she had these symptoms, and we're now giving her a further diagnosis of Stiff Person Syndrome, then it's related. Her testimony regarding what her symptoms were has already been covered in the first trial.

Ultimately, however, after taking the case under advisement, the WCJ rejected Ms. LeBlanc's contention that her SPS was causally related to the work accident. Instead, the WCJ held that SPS is an autoimmune disorder, not related to the work accident.

Ms. LeBlanc contends this constitutes a legal error because more detailed testimony from her was necessary to establish the presumption of causation between the work accident and the SPS diagnosis she received after that judgment was final. Her argument regarding this legal presumption is twofold: first, she was required to show that the disabling symptoms had not manifested themselves before the work accident; second, these symptoms post-accident and prior to her SPS diagnosis indicate a reasonable possibility of causal connection between the accident and the onset of the disabling symptoms. For those reasons, Ms. LeBlanc preserved her testimony regarding that line of questioning as a proffer that is included in the appellate record.

After reviewing the jurisprudence, we agree with Ms. LeBlanc's contention that the WCJ legally erred when it did not allow her testimony that "before the accident [she] had not manifested disabling symptoms, that such symptoms commenced with the accident and manifested themselves thereafter[.]" This

14

testimony, the first prong needed to invoke the presumption of causation, was crucial to Ms. LeBlanc's burden of proof. Only with evidence of this first prong does analysis proceed to the second element, namely that either medical or circumstantial evidence indicates a reasonable possibility of causal connection between the accident and onset of the disabling symptoms. Thus, we find that the WCJ's decision to limit Ms. LeBlanc's testimony constituted legal error and necessitates our de novo review of the record.

Dr. Luris Sanchez ("Dr. Sanchez"), Ms. LeBlanc's family doctor, has treated her since September 18, 2003. After reviewing Ms. LeBlanc's medical record, Dr. Sanchez stated that prior to the work accident in 2010, Ms. LeBlanc did not have restricted mobility, whole body stiffness, problems with reflexes, weakness in her legs, problems with falling, or muscles spasms. However, she did state that Ms. LeBlanc did have epicondylitis in the right elbow, an inflammation of the elbow, prior to 2010, but it resolved. Dr. Sanchez also stated that she treated Ms. LeBlanc for leukocytopenia and that in 2010 she referred her to a hematologist for evaluation.

Dr. Molly B. Thomas "(Dr. Thomas")", a hematologist/oncologist, began treating Ms. LeBlanc on September 1, 2015. She stated that prior to that time, Dr. James L. Cole ("Dr. Cole"), her predecessor, first treated Ms. LeBlanc in 2010 for neutropenia, a benign condition involving a low white blood count common among African Americans, and thrombocytopenia ("ITP"), an immune mediated condition in which her immune system destroys her platelets. Dr. Thomas said that she has prescribed B-12 and iron pills to treat Ms. LeBlanc's low white blood count. As to her ITP, Dr. Thomas said it is mild,[6] treatment is not called for, and she is simply

---

[6] Dr. Thomas characterized Ms. LeBlanc's ITP as mild. She noted that a normal platelet count is around 140. After reporting that Ms. LeBlanc's platelet counts are around 100, 110s, Dr. Thomas said, "[W]e don't even treat ITP until your platelets start getting around 30."

watching it.  When asked if Ms. LeBlanc's ITP diagnosis was connected to her SPS, an autoimmune disease, she stated:

> [A] patient can have lupus and have ITP, which are both auto-immune conditions which . . . doesn't mean necessarily that one causes the other or anything.  It's just that if a patient has one auto-immune condition, they may be prone to having others.  It doesn't mean they're, you know, caused – one causes the other or anything.

In her proffered testimony, Ms. LeBlanc said that prior to her work accident she was healthy, only taking medication for her blood pressure and receiving Vitamin C injections for anemia;[7] she further denied having received a diagnosis of having diabetes and firmly stated that she did not take any medication to treat diabetes.[8]  She also said that prior to her work accident, she was not suffering from spasms or body stiffness, she did not need a cane or walker to walk, and she had no problem with her reflexes.  In stark contrast, Ms. LeBlanc stated that she now suffers from falls and requires a walker.  After the accident she had back spasms and stiffness from the very beginning.  She also noted that she began to have trouble with weight loss within a month or two after the accident.  Because of her work accident, Ms. LeBlanc had to discontinue her Monday night bowling, bike riding, trail riding, fishing, and dancing.  When asked if she suffered stress post-accident, she said that

---

[7]  After reviewing Ms. LeBlanc's medical history, Dr. Lutz summarized her pre-accident medical history as follows:

> [Her] medical problems and diagnoses included cardiac murmur with moderate to severe mitral regurgitation, mild pulmonary hypertension, . . . hypertension, and uterine fibroids.  Records prior to her job-related incident showed some laboratory hematologic abnormalities.  She was even tested for lupus, an autoimmune disorder, in October 2006.  She had an evaluation for left hand tingling in 2006.

In his medical report, Dr. Lutz noted that Drs. Domingue and Jankovic also observed several brain abnormalities on Ms. LeBlanc's MRIs.  Nevertheless, Dr. Lutz referred to them as "red herring brain abnormalities."

[8]  Even though one of the many serology reports showed evidence of Type 1 diabetes, none of the doctors who treated Ms. LeBlanc ever diagnosed her with this disease and the record shows no evidence that she was prescribed medication for diabetes at any time.

16

she encountered stress because Walmart was not paying for her medical care associated with the accident. Finally, Ms. LeBlanc testified that after the work accident until the time she was diagnosed with SPS her symptoms never went away.

After concluding the proffered testimony, the WCJ heard Ms. LeBlanc's testimony beginning with August 5, 2013, the date the previous WCJ provided her oral reasons for judgment. Ms. LeBlanc said she was still experiencing back spasms, continued weight loss, and stiffness, particularly on the left side of the back; she also stated that she began having balance issues and was treated for the first time for vertigo. After she started falling, she first used a cane for balance; when the cane proved inadequate, she began always using a walker. Her falling started suddenly and has caused her to fracture both hips, one in 2016 and the other in 2018—both of which required surgery.[9]

Kwanza LeBlanc ("Kwanza"), Ms. LeBlanc's daughter, also testified about how active her mother was prior to her work accident, to wit: she mowed her grass over six acres; did weedeating; fixed leaking pipes underneath her house; drove her own car; bowled in a league; lived independently; performed chores; swept and mopped the floors; washed dishes; climbed ladders; tilled the garden; and enjoyed traveling. None of this can she now do, including driving a car. Importantly, Kwanza said that because her mother can no longer live alone, she has moved into her mother's home to take care of her.

**ANALYSIS: CAUSATION**

The jurisprudence is well-settled that "an employer takes an employee as he finds him and is liable to him for compensation even when the disabling accident was such only because of a pre-existing disorder in the employee." *Williams v.*

---

[9] Ms. LeBlanc also testified about having a broken clavicle. She did not state when that occurred.

*Liberty Mut. Ins. Co.*, 327 So.2d 462, 468 (La.App. 3 Cir. 1976); *see also Crawford v. Al Smith Plumbing & Heating Serv., Inc.*, 352 So.2d 669 (La.1977). It is also well-settled "that workmen's compensation is payable when an occupational accident aggravates or accelerates a pre-existing condition and produces disability." *Id*. at 672.

> The employee who is abnormally susceptible to disability may be so for a variety of reasons. A preexisting disease or condition may help to bring about the actual injury by accident to such a worker, when it would not do so to a worker without such a preexisting deficiency. The most frequent example of this kind of case is the worker with some form of heart deficiency or other cardiac problem which renders him particularly susceptible to a heart attack. Such an attack has been treated as the "accident" which disables him (if in fact he becomes disabled); a worker without such a deficiency might never suffer such an "accident" and would thus not become disabled.

> There is another group of employees as to whom a preexisting disease or condition does not make them particularly susceptible to an accident, but does make the consequences of that accident disabling when this would not be the result for a normal worker. The typical example is a worker whose injury by accident aggravates a preexisting arthritic or diabetic condition, and the consequences of that disease— now aggravated—disable him.

> There is yet another group of employees as to whom the preexisting condition or disease may retard their recovery, and thus prolong the period of temporary disability which they suffer. Recovery of employees without such a preexisting condition or disease would be more prompt, and this of course would have an effect on the amount of compensation actually paid to such employees.

13 H. Alston Johnson, III, <u>La. Civ. L. Treatise, Workers' Compensation Law and Practice</u> § 232 (5th ed.).

In the present case, it is undisputed that Ms. LeBlanc suffers from SPS. Dr. Lutz (emphasis added) elaborated on Ms. LeBlanc's SPS diagnosis in his medical report:

> a. Classic stiff person syndrome is . . . diagnosed more often in females and is often associated with other autoimmune disorders such as vitamin B12 deficiency, thyroid disorders, and diabetes. It is caused by the abnormal production of nervous system autoantibodies that disrupt neuronal pathways necessary for motor activity. Ms.

LeBlanc fits this category as she had a very high titer of anti-GAD antibodies (see below) as well as a B-12 deficiency.

. . . .

3. Classic stiff person syndrome has the onset, history, physical findings, and clinical course that I addressed in my prior report.

   a. Classic stiff person syndrome is a rare autoimmune-based neurological disease of insidious onset.

   b. The earliest symptoms are usually painful involuntary episodes of back or thigh stiffness.  Back and leg pain/discomfort usually slowly evolve over years.

   c. Muscle spasms occur spontaneously or can be precipitated by certain movements, fright or sound.

   d. Fright or loud noises can induce attacks of rigidity and freezing type activities much like a deer in the headlights.  Other attacks are spontaneous.

   e. Both before and after diagnosis, persons with stiff person syndrome are more prone to unexpected injuries because of their impaired mobility.

   f. As the disease progress[es], spasm attacks that typically begin with paraspinal muscles from the lower back to the neck spread to involve the upper arms and thigh limb muscles. . . .

   g. With disease progress, mobility difficulties become problematic.  Over years gait and mobility become more and more impaired.

   h. Actual diagnosis almost always follows initial onset of symptoms by years to decades.

4. Ms. LeBlanc's history and medical records clearly show that she had signs and symptoms of stiff person syndrome for years before her definitive diagnosis.  Indeed, **it is likely that early manifestations of her disease process were responsible for delayed reflexes and played a part in her being nudged by the backing up truck in the first place.**

5. **Ms. LeBlanc's lack of reflexive movement to avoid the backing-up slow moving truck is consistent with an occult underlying diagnosis of stiff person syndrome.**  As noted above, it is not unusual for persons with stiff person syndrome to go undiagnosed for years.

19

6. The diagnostic pieces of her picture started fitting together in 2015. For the first time, stiff person syndrome was considered a possibility. Laboratory testing included a very high anti-glutamic acid decarboxylase (GAD) antibody titer. GAD is an enzyme necessary to maintain normal muscle motor tone. Persons with impaired GAD activity do not have the normal ability to block muscle stimulation. When GAD is blocked by antibodies, certain muscles cannot relax, and stiffness takes over. High antibody levels against GAD can cause all the neuromuscular problems that Ms. LeBlanc had and more. Her diagnosis with stiff person syndrome was confirmed by [Dr. Jankovic,] a neurologist in Houston who specializes in movement disorders.

It cannot be denied that Dr. Lutz, the physician Walmart asked to provide an opinion regarding causation, stated "[t]here are no medically accepted or peer reviewed medical research or publications linking the causation of stiff person syndrome to trauma[.]" On this point, it must be noted that Dr. Heard, Ms. LeBlanc's treating orthopedist, initially opined that the trauma of the accident and stress caused her SPS; he would later emphasize stress and would not mention trauma in his later medical reports. Neither Dr. Domingue nor Dr. Jankovic viewed trauma as a cause for SPS. Dr. Jankovic stated, however, that "[i]t is quite likely the stress of the accident triggered the onset of her SPS but the link is hard to establish with certainty." Dr. Domingue was never asked to offer an opinion on whether the stress of the accident had anything to do with the manifestation of Ms. LeBlanc's SPS.

However, the jurisprudence on the presumption of causation does not require proof with certainty. Rather, "the testimony as a whole must show that more probably than not an employment accident occurred and that it had a causal relation to the disability." *Johnson*, 339 So.3d at 670.

Dr. Lutz's in-depth analysis of Ms. LeBlanc's medical history and his review of the video of the work accident shows that it was likely that early SPS manifestations of her disease process were responsible for her delayed reflexes at the time of the work accident. He further opined that Ms. LeBlanc's delayed reflexes

20

played a part in her being nudged by the backing-up truck in the first place and that

the lack of reflexive movement to avoid the backing-up, slow moving truck is

consistent with a hidden, underlying diagnosis of SPS.

In *Buxton v. Iowa Police Department*, 09-520, pp. 17–18 (La. 10/20/09), 23

So.3d 275, 286–87, the supreme court discussed *Houghton v. Fireman's Fund*

*American Insurance Cos.*, 355 So.2d 927, 929 (La.1978):

> "If an accident causes a disability from which a workman would have recovered except for further disability produced by a separate, intervening cause, there is no liability for compensation beyond the disability produced by the job connected accident." However, "[w]hen there is an accident and a resulting disability without any intervening cause, it is presumed that the accident caused the disability." *Id.* Haughton was employed as a common laborer. While on the job, he stumbled while carrying a heavy timber and fell, breaking his left thigh bone. He was hospitalized, and the fracture was surgically reduced and fixed with a steel plate and screws. Post-surgery tests suggested a bone marrow disorder, which was subsequently diagnosed as multiple myeloma. The break was thought to have been a "pathological fracture," caused by weakening of the walls of the bone. In addition to the orthopedic treatment, Haughton was placed under the care of a hematologist for the control and treatment of the myeloma. The orthopedic surgeon ascribed a 25 percent residual disability to the left leg "as a result of the injury and subsequent surgery." When the employer discontinued compensation benefits on the grounds that Haughton was totally disabled by the myeloma and not the broken leg, Haughton brought an action claiming workers' compensation benefits for total disability allegedly caused by the work-related injury. The trial court judgment denying compensation was affirmed by the court of appeal. *Haughton v. Fireman's Fund American Ins. Companies,* 349 So.2d 385 (La.App. 4 Cir.1977).

> This court granted certiorari and reversed. *Haughton,* 355 So.2d 927. We noted that causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the court, based on all the credible evidence. We found there was no evidence of an intervening cause. Nothing happened to Haughton after the accident except his failure to recover; he did not suffer a new accident or disease; the disease he had when the accident occurred contributed to the injury itself.

The same analysis and reasoning apply here. After reviewing the entirety of

the testimony and medical reports, the evidence supports not only that Ms. LeBlanc

likely had SPS at the time of the work accident but also, in Dr. Lutz's opinion, it is

likely that her poorer reflexes associated with SPS played a part in the accident. Accordingly, we find that Ms. LeBlanc established that there was a presumption that the work accident caused her disability, including her SPS.

However, this presumption is not conclusive. Rather, it required Walmart to come forward with sufficient contrary evidence to rebut it. La.Code Evid. arts. 304, 306; *see also Hall v. Folger Coffee Co.*, 03-1734 (La. 4/1/4/04), 874 So.2d 90. In Walmart's argument against there being a presumption of causation, it stresses that Ms. LeBlanc did not experience a flare-up of her SPS until 2015, almost five years post-accident. For reasons which follow, we find no merit to its contention.

The *Walton* decision established that one of the essential elements of proof to support the presumption is that it be shown that such symptoms commenced with the accident and manifested themselves thereafter. *Walton*, 475 So.2d 320. Even though it is true that Ms. LeBlanc did not suffer a full manifestation of SPS until 2015, the medical evidence shows immediate post-accident manifestation consistent with SPS, which continued, namely: stiffness in the joints; tenderness and spasms in the lumbar and paralumbar region; slow gait; lumbar spasms with occasional giving way of the legs; and severe limitation of extension of the lumbar spine. In addition to that, the WCJ who presided over that first trial commented: "I thought Ms. LeBlanc was very credible. She appeared stiff. She appeared to be in pain." Likewise, the record is void of any finding of the succeeding WCJ that would cast doubt on Ms. LeBlanc's credibility.

Continuing along those same lines, the first WCJ stated: "The only thing out of whack, so to speak, is that her complaints were all over the place. And that was problematic. However, I believe her and I believe her complaints regardless of how odd they might have been." Armed with the knowledge later obtained through research and testing by the various medical professionals, the ultimate SPS diagnosis

22

sheds light on those observations. The fact that Ms. LeBlanc may have had a yet-to-be-diagnosed autoimmune disease does not eliminate her right to compensation, even though her SPS may have made her more susceptible to injury. *Bertrand*, 221 So.2d 816; *in accord Deason v. Allstate Ins. Co.*, 95-663 (La.App. 1 Cir. 12/15/95), 669 So.2d 445, *writ denied*, 96-1061 (La. 5/31/96), 673 So.2d 81.[10]

We find that the evidence establishes not only that Ms. LeBlanc likely had SPS at the time of the work accident but also that her poorer reflexes because of SPS played a part in the accident and the injuries that flowed from that accident. Accordingly, we find that Ms. LeBlanc proved a causal relationship between her work accident and the manifestation of her SPS after the accident. Therefore, with that finding, we will address the two motions to modify Ms. LeBlanc's disability status.

## THE MOTIONS TO MODIFY DISABILITY STATUS

Ms. LeBlanc argues that there was no merit to Walmart's motion to modify the prior award which had found her entitled to temporary total weekly workers' compensation benefits. She further asserts that considering her SPS diagnosis, her award should be modified to have her declared entitled to permanent and total disability benefits. Walmart contends that there is no merit to Ms. LeBlanc's arguments and urges us to find Ms. LeBlanc is no longer qualified to receive temporary total disability. We will first address Walmart's motion to modify.

---

[10] In *Deason*, 669 So.2d at 450, the appellate court addressed a pre-existing autoimmune disease and its impact on injuries suffered in an accident. There, it stated:

> The jury may have reasonably found, after hearing all the testimony, Deason's suffering was related only marginally to the accident and was more related to her other health problems. Nevertheless, the testimony and medical documentation demonstrate Deason clearly suffered acute distress as a direct result of the accident, and her other problems, whether a nondescript autoimmune disease or degenerative arthritis, appear to have been exacerbated by the stress of this event.

.

## Walmart's Position

Relying on the medical reports generated in 2015 by Dr. Budden, Dr. Billodeaux, and Dr. Broussard,[11] all of whom concluded Ms. LeBlanc was at MMI and able to return to work, Walmart contends the prior workers' compensation award should be modified. In further support of its contention, Walmart relies on a 2018 FCE which found Ms. LeBlanc was able to perform at least sedentary work duties. Finally, Walmart points out that Dr. Lutz, who examined Ms. LeBlanc in 2019 after she had been diagnosed with SPS, agreed with the opinions of Drs. Budden, Billodeaux, and Broussard regarding her being at MMI and that any injury from the work accident would have been resolved.

## Ms. LeBlanc's Argument

Ms. LeBlanc contends that Walmart failed to show any change in her medical condition which would allow the discontinuation of her prior disability award. She argues that Dr. Broussard, who performed an IME, was provided incorrect facts, did not have all the medical records, was not informed of her SPS diagnosis, and was unable to explain the severity of her symptoms.

Ms. LeBlanc further points out that although she attended a FCE on January 29, 2018, the physical therapist reported that she had to use a rolling walker through the evaluation, demonstrated a slow cadence with decreased left single leg stance, and intermittently dragged her left toe during swing phase. Thus, she argues that her

---

[11] "Louisiana Revised Statutes 23:1122 allows for the submission of a medical report in lieu of testimony as prima facie evidence of the facts contained therein." *Lemoine v. Hessmer Nursing Home*, 94-836, p. 10 (La.App. 3 Cir. 3/1/95), 651 So.2d 444, 450. "Upon the receipt by either party of such a report from the other party, the party receiving it, if he disputes the report or any statement therein, shall notify the other of that fact within six days, otherwise the report shall be prima facie evidence of the facts therein stated in subsequent proceedings under this Chapter." La.R.S. 23:1122. "Something considered 'prima facie,' as is this statutory presumption, is defined, in part, as 'a fact presumed to be true unless disproved by some evidence to the contrary.'" *City of Jennings v. Deshotel*, 99-1232, p. 6 (La.App. 3 Cir. 2/2/00), 758 So.2d 269, 273, *writ denied*, 00-663 (La. 4/20/00), 760 So.2d 1157 (quoting, in part, BLACK'S LAW DICTIONARY 825 (abr. 6th ed. 1991).

inability to stand for more than ten minutes and that she was always required to use the rolling walker when standing and walking, showed that she is unable to work in a sedentary capacity.

Contrary to Walmart's medical evidence, Ms. LeBlanc argues that Dr. Heard, her treating orthopedic physician, relying on the change in her living environment and the heavy doses of muscle relaxants and Valium she takes, has opined that not only has her medical condition not improved, but she is also permanently and totally disabled. In support of that opinion, she further relies upon the like opinion of Dr. Sanchez, her family physician.

**THE LAW**

In *Broussard v. Asco Venture Holdings*, 17-90, 17-91 pp. 7–8 (La.App. 3 Cir. 10/4/17), 229 So.3d 80, 86–87, we stated:

> As noted in *Gabriel v. Lafourche Parish Water District*, 12-797[, p. 6] (La.App. 1 Cir. 2/25/13), 112 So.3d 281, 285, *writ denied,* 13-653 (La. 4/26/13), 112 So.3d 848 (footnote omitted):
>
>> The modification power of LSA–R.S. 23:1310.8(A) and (B) exists for the purpose of modifying awards due to a change in the worker's condition. Because changes in medical condition and disability status are dynamic and ongoing by their nature, the legislature enacted LSA–R.S. 23:1310.8(A) and (B) to afford needed flexibility to ensure that benefits correspond to such changes. Res judicata thus cannot preclude litigation seeking a change in the amount of compensation benefits based upon a change in disability. *Chaisson v. Central Crane Service*, 2010–0112 at p. 944 So.3d at 888 n. 6.
>
> A judgment of the workers' compensation judge can only be modified "on the ground of a change in conditions." La.R.S. 23:1310.8(B); *See Anzalone v. Allstate Ins. Co.*, 97-866 (La.App. 1 Cir. 4/8/98), 714 So.2d 18, *writ denied*, 98-2180 (La. 11/13/98), 730 So.2d 939; *Gabriel,* 112 So.3d 281.

"A party who seeks modification of a workers' compensation judgment must prove by a preponderance of the evidence that the worker's disability has increased or diminished." *Lormand v. Rossclaire Const.*, 01-515, p. 2 (La.App. 3 Cir.

25

12/12/01), 801 So.2d 675, 676. "The modification statute is to be liberally construed in favor of the claimant[.]" *Jackson v. Iberia Par. Gov't*, 98-1810, p. 9 (La. 4/16/99), 732 So.2d 517, 524.

*Walmart's Motion to Discontinue Temporary Total Disability Benefits*

Louisiana Revised Statutes 23:1221(1)(a) provides that "[f]or any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages," the injured employee shall receive TTDs "during the period of such disability." The statute provides, however, that such benefits

> shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required.

La.R.S. 23:1221(1)(d). "[W]hen the claimant no longer requires treatment and his physical condition has stabilized, an award for TTD benefits is no longer appropriate and a determination regarding the extent of the Claimant's disability must be made." *Numa C. Hero & Son v. Leleux*, 15-305, p. 6 (La.App. 3 Cir. 10/28/15), 178 So.3d 595, 600 (quoting *Navarre v. K-Mart*, 01-753, p. 6 (La.App. 5 Cir. 11/27/01), 803 So.2d 206, 209. This is further supported by La.Admin. Code. tit. 40, Pt. I, § 2115 which states that "MMI is declared when a patient's condition has plateaued and the authorized treating physician believes no further medical intervention is likely to result in improved function."

To support its motion to modify Ms. LeBlanc's disability rating, Walmart relied upon the medical reports of Drs. Budden, Billodeaux, Broussard, and Lutz, as well as the FCE she underwent in 2018 at Rosewood Rehabilitation.

Dr. Budden examined Ms. LeBlanc on June 10, 2015, for a second medical opinion concerning the injuries she sustained on November 2, 2010. After he

26

reviewed her medical records and conducted a physical examination, he opined that Ms. LeBlanc reached MMI within months of her work related accident and specifically observed that she had not been evaluated by her treating physicians in more than a year. He further stated that she could immediately return to her employment without any limitations based on her work related injury.

Shortly thereafter, on June 17, 2015, Dr. Billodeaux examined Ms. LeBlanc for a second medical opinion. After making similar findings to that of Dr. Budden, Dr. Billodeaux opined that Ms. LeBlanc reached MMI within six weeks following the work related accident. He, too, advised that Ms. LeBlanc could return to full duty work without limitation because he could not find any medical reason why her employment should be limited.

Later, on September 15, 2015, Dr. Broussard performed an examination of Ms. LeBlanc pursuant to a court-ordered IME. He supported the opinions of Drs. Budden and Billodeaux and stated that Ms. LeBlanc "has long reached maximum medical improvement." Finding no objective evidence or physical findings to indicate that Ms. LeBlanc was unable to return to work, he concluded that she could have returned to work within a few months of the work accident.

After Ms. LeBlanc's motion to compel an FCE was granted, she was evaluated at Rosewood Rehabilitation on January 23, 2017. In the evaluation it was noted that Ms. LeBlanc had been referred with "diagnoses of cervical pain and lumbar pain, and . . . left knee pain since the work-related incident in 2010." No mention of her SPS diagnosis was made. It was also noted that she underwent a left total hip replacement in 2016 after falling and fracturing the hip. Ultimately, the FCE advised that Ms. LeBlanc could perform sedentary work.

On February 27, 2017, Dr. Lutz reviewed selected medical records at the request of Walmart to offer an opinion as to whether Ms. LeBlanc's on-the-job

27

accident that occurred on November 2, 2010, caused or could have triggered stiff person syndrome. After reviewing Ms. LeBlanc's medical records, Dr. Lutz provided three major opinions: (i.) she has classic SPS, an autoimmune disorder; (ii.) her SPS was in no way caused or triggered by being hit during her on-the-job incident of November 2, 2010; and (iii.) there are no medically accepted or peer reviewed medical research or publications linking the causation of SPS to trauma.

Later, on October 22, 2019, Dr. Lutz examined Ms. LeBlanc for a second medical opinion. After reviewing Ms. LeBlanc's medical records and conducting his examination, Dr. Lutz maintained the three major opinions he made earlier on February 27, 2017, which addressed causation. In addition, Dr. Lutz agreed with the three physicians who evaluated Ms. LeBlanc in 2015, Dr. Budden, Dr. Billodeaux, and Dr. Broussard, regarding the causation of her initial injuries and that she had long achieved MMI from those injuries.

It is well accepted that "[a]n IME's medical conclusions are given significant weight because the IME is an objective party;" however evaluation of all the evidence presented should be used in deciding a claimant's medical condition. *Numa C. Hero & Son*, 178 So.3d at 602; *see also Richardson v. Lil' River Harvesting*, 09-1090 (La.App. 3 Cir. 3/10/10), 33 So.3d 418.

In the present case, Dr. Broussard provided an initial IME report in June 2015. Dr. Broussard's report that Ms. LeBlanc had reached MMI, a determination like that reached by Drs. Budden and Billodeaux, was made months before Ms. LeBlanc was diagnosed with SPS and only encompassed her initial injuries. Thus, it is evident that their opinions on this critical issue must be understood considering that fact.

The record also shows that Dr. Broussard supplemented his June 2015 report with one rendered on September 7, 2016, after Ms. LeBlanc's SPS diagnosis. Despite the timing of that supplementation, it is evident that Dr. Broussard was

28

unaware of the SPS diagnosis and appears to have based his opinion on unspecified notes of Dr. Heard, Ms. LeBlanc's treating orthopedist. Dr. Broussard's letter to the OWC supports that finding. There he stated:

> I had the opportunity to see Ms. Le[B]lanc one year ago and at that time I felt that her findings were nonorganic [,] and I think is consistent with the report Dr. Heard wrote. As you know [,] now she is 6 years status post the injury. She has chronic complaints of pain. As you know pain is strictly subjective. There were no objective findings on the physical exam forwarded to me of a pathological nature. The x-ray studies reported in Dr. Heard's notes are consistent with chronic degenerative disease.
>
> Finally, I do not believe that the report forwarded to me changes my original opinion.

Unlike the reports of Drs. Budden, Billodeaux, and Broussard, which did not reference her SPS diagnosis, Dr. Lutz's medical reports show that he was keenly aware of the SPS diagnosis when he examined Ms. LeBlanc. Although Dr. Lutz embraced the opinion on MMI reached by Drs. Budden, Billodeaux, and Broussard, we recognize that Walmart utilized him to support its contention that there was no causal link between the work accident and the SPS diagnosis. Because of that we find it necessary to take a closer look at the record because it is difficult to reconcile that simple statement with Dr. Lutz's other comments in his two medical reports.

In his 2017 report Dr. Lutz provided this background information about SPS:

> Initial therapy is symptomatic with benzodiazepine muscle relaxants such as Valium, but progressive muscle stiffness and rigidity is the rule. Various experimental treatments including plasmapheresis or intravenous immunoglobulins are sometime tried. The disorder usually progresses with chronic pain, postural deformities, impaired mobility with a rigid gait, and spine abnormalities. This leads to a wide-based and unsteady walking described as the "Frankenstein gait". The inability to walk safely[] leads to increased falls, another common complication of this order. In extreme cases, persons become unable to bend over or even walk. As would be expected with such a symptomatic chronic disease, psychological problems also abound.

On October 22, 2019, almost four years after Ms. LeBlanc's SPS diagnosis, Dr. Lutz recorded the following symptoms when he examined her:

29

> Her symptoms include multiple pain sites and difficulty walking. The primary sites of her pain are her back, arms, and legs. She describes limb stiffness and rigidity. She has difficulty in changing position. She is unable to walk without a cane and uses a walker to get around.

Dr. Lutz also provided the following notation concerning his examination of Ms. LeBlanc: "MUSCULOSKELETAL: ambulatory w walker, reports tenderness to palpation arms, legs, and spine from neck to sacrum, I did not observe any muscle spasms (she is on medications)."

As indicated earlier, MMI is premised on two elements—the patient no longer requires treatment, and her physical condition has stabilized. *Numa C. Hero & Son*, 178 So.3d 595.

Dr. Domingue was the first medical professional to definitively diagnose Ms. LeBlanc with SPS. After Dr. Domingue used increased doses of diazepam (Valium) to help control Ms. LeBlanc's SPS, he found that it had limited effectiveness and caused her to sleep most of the day. He then obtained authorization from Ms. LeBlanc's private insurance carrier to begin intravenous immunoglobulin therapy ("IVIG"), a therapy which continued through the latest trial. Even though Dr. Domingue has not commented on whether Ms. LeBlanc has reached MMI, his observations of his patient since 2015 are illuminating. Among his many medical notes on Ms. LeBlanc are the following observations: her gait is slow and stiff; she has complaints of unsteadiness and falling; "[w]hen she walks she has a very short step and slow gait and a left tilt of the trunk"; "[s]he is very unstable and requires support in order to stand"; her "[p]ostural reflexes are poor and she struggles but does not fall"; "[s]he had diffuse tremors when her IVIG treatment was delayed to a six-week interval instead of four"; "[t]he Valium makes her sleepy but efforts to drop the dose to 5 mg 3/day led to an increase in spasms in her back and inability

for the patient to care for herself." And in one of the latest notes in 2019, even after at least twenty-five IVIG infusions, Dr. Domingue commented:

> She is quite rigid in the trunk and has normal tone in the limbs. She walks only with a walker and very slowly. She is still quite stiff and has low back and right lower extremity pain. Because of the Valium and Robaxin her memory is poor. She takes 25 mg of Valium/day.

The medications Ms. LeBlanc was taking are identified in Dr. Lutz's medical reports; among those medications were Valium, Robaxin, Gabapentin, and IVIG infusions monthly. After reviewing Ms. LeBlanc's medical records, including the medical reports of Dr. Domingue and Dr. Heard, it appears that all these medications are being used on an ongoing basis to address her SPS.[12] Additionally, the records from Reliant Healthcare, the healthcare provider which oversees her infusions, also show that Ms. LeBlanc's IVIG infusions are administered twice monthly over a three to four hour period; the record further establishes that these infusions began on August 31, 2018, and were still continuing as of May 14, 2021. There was no testimony that these infusions would no longer be needed at some point. Likewise, even though the dosages of Valium and Robaxin have been adjusted at various times because of the drowsiness they caused and their impact on Ms. LeBlanc's memory, there, too, was no indication that these medications would become unnecessary.

We further note the observation of Dr. Domingue, "[Kawanza,] the daughter [of Ms. LeBlanc,] informed me that Dr. Jankovic recommended a trial of

---

[12] According to PDR.Net by ConnectiveRX, www.pdr.net (accessed July 31, 2024): Valium (diazepam) is used for anxiety, skeletal muscle spasm, and seizure disorders; Robaxin is a muscle relaxant used for the treatment of musculoskeletal conditions associated with acute, painful musculoskeletal conditions; Gabapentin is used for restless legs syndrome, posthererpetic and other neuralgias, and adjunctively for partial seizures. From Ms. LeBlanc's daughter, it was testified that Ms. LeBlanc takes 10 mg of Valium at 10 a.m. and 500 mg of Robaxin at 2 p.m. and again at 7 p.m.

rituximab.[13]  I am not impressed that we have helped a lot.  Hopefully the rituximab will help."

Dr. Heard, the orthopedist who has treated Ms. LeBlanc since January 25, 2011, first opined on March 20, 2017, after Ms. LeBlanc's SPS diagnosis, that she was unable to work, and she had not reached MMI.  He has maintained that opinion throughout his treatment of her.[14]  Even though he readily admitted that he had never treated SPS, it cannot be denied he is very familiar with Ms. LeBlanc's physical condition, including her SPS diagnosis, her physical deficiencies, whether she no longer needs treatment, and whether her physical condition has stabilized.

After carefully reviewing the record de novo and considering the jurisprudence, we find that the evidence preponderates that Ms. LeBlanc needs longer treatment, and her physical condition has not stabilized.  For these reasons, we find no merit to Walmart's motion to modify Ms. LeBlanc's disability status.

*Ms. LeBlanc's Motion to Increase Benefits to Permanent and Total Disability*

Ms. LeBlanc contends that her disability should be increased to permanent and total disability status.  Alternatively, Ms. LeBlanc further argues that if we find that a full evidentiary hearing was not held below, she requests that we remand the matter to the WCJ for a full evidentiary hearing on her motion to allow the court to address the requisite non-physical factors that have to be addressed, including, but

---

[13] The use of Rituximab for the treatment of SPS is still being studied.  According to the National Institute of Neurological Disorders and Stroke,

> Preliminary experience in some non-malignant antibody-mediated disorders has shown that Rituximab was beneficial in improving the patient's symptoms and reducing antibody level.  SPS is an antibody-mediated autoimmune disease affecting GABA-ergic transmission resulting in incapacitating stiffness and spasms.

"Rituximab to Treat Stiff Person Syndrome," https://www.ninds.nih.gov/health-information/clinical-trials/rituximab-treat-stiff-person-syndrome (accessed on 7/8/2024)

[14] Dr. Heard has also added his opinion that Ms. LeBlanc is permanently and totally disabled.  We will address that issue in the next portion of this opinion.

32

not limited to, her rehabilitation and whether she is capable of retraining in connection with a claim for permanent and total disability.

In *Stelly v. CNA Insurance Co.*, 15-379, pp. 5–6 (La.App. 3 Cir. 10/21/15), 177 So.3d 159, 163, *writ denied*, 15-2080 (La. 1/8/16), 184 So.3d 697, (emphasis in the original), we stated:

> A finding of permanent total disability status requires a consideration of two statutes, La.R.S. 23:1221 and La.R.S. 23:1226. Our supreme court has instructed that when considering such claims, these statutes are to be read *in pari materia*. *Comeaux v. City of Crowley*, 01-32 (La.7/3/01), 793 So.2d 1215.
>
> Louisiana Revised Statutes 23:1221(2) sets forth the burden of proof that an employee seeking an award of permanent and total disability benefits must satisfy. When, as in the instant matter, an employee is not currently employed, La.R.S. 23:1221(2)(c) (emphasis added) is the controlling statutory provision, which provides as follows:
>
>> For purposes of Subparagraph (2)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (2)(b) of this Paragraph, compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is **physically unable to engage in any employment** or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
>
> Louisiana Revised Statutes 23:1226(D) (emphasis added), provides in relevant part:
>
>> Prior to the workers' compensation judge adjudicating an injured employee to be permanently and totally disabled, the workers' compensation judge shall determine whether there is **reasonable probability** that, with appropriate training or education, the injured employee may be **rehabilitated to the extent that such employee can achieve suitable gainful employment and whether it is in the best interest of such individual to undertake such training or education**.

33

*See also Odom v. Kinder Nursing Home*, 06-1442, p. 5 (La.App. 3 Cir. 4/25/07), 956 So.2d 128, 132, which further stated that "[t]he issue of disability is determined with reference to the totality of the evidence, including both lay and medical testimony."

Proof by clear and convincing evidence requires more than "a preponderance of the evidence," the traditional measure of persuasion, but less than "beyond a reasonable doubt," the stringent criminal standard. *Succession of Bartie*, 472 So.2d 578 (La.1985). Proof by a preponderance requires that the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. *Prestenbach v. Sentry Ins. Co.*, 340 So.2d 1331 (La.1976). To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. *Louisiana State Bar Ass'n v. Edwins,* 329 So.2d 437 (La.1976). The distinct standard, persuasion by clear and convincing evidence, is usually applied "where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds." *McCormick on Evidence,* § 340(b), p. 798 (2d Ed.1972).

We have outlined Ms. LeBlanc's physical state earlier in this opinion. We have also referenced Kwanza's firsthand observations of her mother's physical state. Because the testimony of Ms. LeBlanc's physical limitations has been well documented, we will not rehash them at this juncture.

In the present case, the WCJ never reached the issue of Ms. LeBlanc's permanent and total disability because it found her SPS was not causally connected with her work accident. Because we have concluded that the WCJ erred in finding no causal connection between Ms. LeBlanc's SPS and the work accident, we find it necessary to remand this case to the WCJ to adjudicate Ms. LeBlanc's permanent and total disability claim under the provisions of La.R.S. 23:1221 and 23:1226(D).

34

In doing so, the WCJ may entertain updated information on Ms. LeBlanc's physical limitations, as well as her medical condition since the time of this last hearing.

Related to that determination is Ms. LeBlanc's contention that Dr. Heard's continued treatment of her is required because her medical condition has not resolved. Considering her need for continuing treatment, she argues that she is entitled to payment of Dr. Heard's medical billings for treatment incurred since the original trial. Because the WCJ rejected Ms. LeBlanc's SPS causation argument, it never reached her contention that she was entitled to have Dr. Heard's outstanding balance of $5,050.00 paid.[15] In accord with that determination, the WCJ's judgment is silent on this issue. Even though Ms. LeBlanc's documentation of that outstanding balance was presented at trial and is in the appellate record, the WCJ did not address whether Dr. Heard's treatment was reasonable and necessary. On remand, the WCJ is instructed to make this determination as to those sums and any other like medical billings that have occurred subsequently, and to make an award accordingly.

**PENALTIES AND ATTORNEY FEES**

Ms. LeBlanc has raised several allegations that penalties and attorney fees are owed for various failures to timely pay medical expenses. Included in her brief to this court, are specific arguments involving: (1) Dr. Mack; (2) Dr. Heard; (3) Laborde Physical Therapy; (4) Dr. Hodges; and (5) Walmart's denial of an FCE.[16]

---

[15] The record is confusing in this regard. Ms. LeBlanc entered two sets of billings from Dr. Heard. Plaintiff's Exhibit 4 ("P-Ex. 4") in the amount of $7,880.00 covers medical charges from May 20, 2011, through July 27, 2015. In its judgment, the second WCJ denied Ms. LeBlanc's "claim for penalties and attorney fees related to Dr. Michael Heard's bills totaling $7,880.00[.]" Later, Plaintiff's Exhibit 105 ("P-105"), showing an outstanding balance of $5,050.00, duplicates the charges outlined in P-Ex. 4, and adds charges from November 2, 2016, through December 22, 2021. Even though Ms. LeBlanc has briefed the unpaid $5,050.00 balance reflected in P-Ex. 105, she has not briefed the WCJ's rejection of penalties and attorney fees as to the $7,880.00; see footnote 15 infra. Nevertheless, Ms. LeBlanc has requested payment of Dr. Heard's medical billings totaling $5,050.00.

[16] The WCJ judgment also rejected penalty claims for failure to pay: (a) for Hydrocodone medication; (b) the medical bill from St. Thomas Clinic for May 23, 2012; (c) Laborde Diagnostics for service on August 11, 2011; (d) Pharmacy Partners for services on May 26, 2012 and June 4,

We will group those where there is a common basis and individually address the others. Applicable to each of these claims is the well-established principle that workers' compensation statutes providing for penalties and attorney fees are penal in nature and must be strictly construed. *McCallon v. Key Energy Servs.*, 20-635 (La.App. 3 Cir. 12/15/21), 342 So.3d 1059, *writ denied*, 22-324 (La. 4/12/22), 336 So.3d 89.

The following facts are essential to the resolution of some of the claims. Ms. LeBlanc sustained a work accident on November 2, 2010. From the outset Walmart approved treatment of the injuries to Ms. LeBlanc's left shoulder and both knees as compensable. Ms. LeBlanc then filed a disputed claim for compensation seeking further medical treatment and indemnity benefits for the disability associated with her neck and back. When Walmart did not approve treatment for the neck and back, this matter proceeded to trial on October 17, 2012. In an oral ruling on August 5, 2013, later reduced to writing in a judgment on February 19, 2015, the WCJ ordered weekly indemnity benefits, finding the neck and back injuries to be causally related to the accident. It then ordered Walmart to reimburse Ms. LeBlanc for out-of-pocket expenses to Dr. Domingue and Laborde Diagnostic; it further ordered Walmart to pay outstanding medical bills from Dr. Mack, Dr. Heard, Laborde Diagnostic, and Physician's Partner. As noted earlier, this court affirmed that judgment on November 14, 2015.

---

2012; (e) Laborde Physical Therapy; and (f) Dr. Heard's bills totaling $7,880.00; and the failure to approve: (i) physical therapy recommended by Dr. Mack and Dr. Heard; and (ii) treatment with Dr. Mack. Uniform Rules—Courts of Appeal, Rule 2–12.4 requires all specifications or assignments of error to be briefed. Where a party advances no argument whatsoever for one of his alleged specific assignments of error, the court may consider that assignment of error abandoned. *LeBlanc v. LeBlanc's Auto. & Glass Center, LLC*, 22-564 (La.App. 3 Cir. 4/12/23), 363 So.3d 1240. Since Ms. LeBlanc has failed to address these other claims, we deem them abandoned. However, we will address those which have been briefed.

*Payments related to the initial judgment of February 19, 2015*

Ms. LeBlanc contends that Walmart failed to timely pay the outstanding bills of Dr. Mack, a family medicine specialist, and Dr. Heard within thirty days of December 4, 2015, the date the original judgment became final.[17]

Louisiana Revised Statutes 23:1201(G) states, in pertinent part:

> If any award payable under the terms of a final, nonappealable judgment is not paid within thirty days after it becomes due, there shall be added to such award an amount equal to twenty-four percent thereof or one hundred dollars per day together with reasonable attorney fees, for each calendar day after thirty days it remains unpaid, whichever is greater, which shall be paid at the same time as, and in addition to, such award, unless such nonpayment results from conditions over which the employer had no control. . . . The total one hundred dollar per calendar day penalty provided for in this Subsection shall not exceed three thousand dollars in the aggregate.

Subsection G applies to the actions of the employer after a final judgment/settlement. *Fontenot v. Sonnier*, 09-1215 (La.App. 3 Cir. 4/7/10), 34 So.3d 473. Commenting further, the *Fontenot* court stated, "a plain reading of Subsection G raises two questions: (1) was the payment timely, and (2) if not, did the delay result from conditions beyond the employer's control. The first question results in a straight yes or no answer. The second question delves into the reasons behind the employer's late payment[.]" *Id.* at 476–77.

Regarding the first question, "Was the payment timely," the payments to Drs. Mack and Heard were untimely. Dr. Mack's payments were made on February 9, 2017, approximately fourteen months after the final judgment. Dr. Heard's payments were made on March 23 and 24, 2016, approximately three months after the final judgment.

---

[17] In its reasons for judgment, the WCJ rejected both claims, stating simply that they had been paid. No mention was made of whether those payments were untimely.

Dr. Mack treated Ms. LeBlanc in 2010 and 2011, shortly after the work accident. Larissa J. Sabatini ("Ms. Sabatini"), a case manager for Claims Management, Inc. ("CMI"), testified that she wrote Dr. Mack on December 16, 2015, asking him to submit a UB92 or a HCFA 1500 for all outstanding dates of service from November 2, 2010. Specifically, the certified letter stated, "In order to pay these bills Claims Management, Inc. must have the following: Complete medical records, which should include an outline of onset and history of patient's condition along with the bill on a UB92 or HCFA 1500 form." Dr. Mack refused the certified mail on December 21, 2015.

Ms. Sabatini further stated that she did not receive the bills she requested until January 27, 2017, when counsel for Ms. LeBlanc sent the requested forms to her requesting that Dr. Mack's medical bills for the treatment of Ms. LeBlanc "be submitted in line for payment." On February 9, 2017, within thirty days of counsel's letter, CMI issued a check to Dr. Mack for $2,504.60.

Based upon these facts, we find that the nonpayment resulted from conditions over which CMI had no control. Accordingly, we find that no penalties and attorney fees are due.

Regarding Ms. LeBlanc's claim for penalties and attorney fees for the untimely payment of Dr. Heard's medical expenses, the record shows that on December 21, 2015, Ms. LeBlanc's counsel sent a letter to Walmart's counsel with an updated, itemized billing statement from Dr. Heard showing treatment to her from 2011 to 2014. The record further shows that Dr. Heard also later provided Walmart with health insurance claim forms dated March 3, 2016, for the same period.

In her deposition, Ms. Sabatini did not mention the December 21 correspondence from Ms. LeBlanc's counsel to Walmart's counsel. She did say that after the judgment was final, without specifying a date, she requested that Dr. Heard

38

provide her with the outstanding billing, and it took him a while to get them to her. This would seem to correspond with the claim forms dated March 3, 2016. Accordingly, Ms. Sabatini said she processed this later payment within thirty days of receipt of those forms even though it probably resulted in an overpayment to Dr. Heard.

Walmart argues that Dr. Heard failed to code and bill for services to assure the services were not bundled or duplicated, and the fees were not excessive. It also argues that the timely submission of proper claim forms would have avoided this confusion. Thus, considering Dr. Heard's filings dated March 3, 2016, it argues that its payments were timely made. We find no merit to Walmart's argument.

After reviewing the Workers' Compensation Act, we find that although the Act refers to the Louisiana Administrative Code regarding the reimbursement schedule, it does not provide for a specific procedure for how employers receive medical billings. *See Perron v. St. Landry Par. Econ. Indus. Dev. Dist.,* 03-1061 (La.App. 3 Cir. 3/3/04), 867 So.2d 86, *writ denied*, 04-1502 (La. 10/1/04), 883 So.2d 1009; *Nuzum v. TCI Turner Corp.*, 02-1232 (La.App. 1 Cir. 3/28/03), 857 So.2d 520 (commenting on La.R.S. 23:1201(E)).

We also observe that the billing submitted to Walmart's counsel on December 21, 2015, included Ms. LeBlanc's full name; her telephone number; the ICD codes; the service rendered; the dates of the visits, the service provided, and the charges for the medical service; and Dr. Heard's complete name and address. Additionally, we also note that Walmart already had Ms. LeBlanc's address, her social security number, and the date of injury from the case file. Even though Walmart contends that having the proper claims form from Dr. Heard would have allowed it to ascertain that the care was covered and consistent with the treatment guidelines, it admits that it probably overpaid Dr. Heard even though it eventually had the proper forms. We

39

find that Walmart failed to show that its late payment of the medical billings of Dr. Heard ordered in the original judgment was the result of conditions over which it had no control. Thus, we order Walmart to pay a penalty of $3,000.00 and an attorney fee of $5,000.00 for its untimely payment of Dr. Heard.

*Mileage reimbursements for treatment post-judgment*

On December 12 and 19, 2014, Ms. LeBlanc submitted mileage reimbursement forms for travel expenses she incurred for roundtrips from her home to Laborde Physical & Occupational Therapy for treatment of her neck and back. The 2014 dates involved were August 18, 19, 25, and 28, September 3, 4, 8, 9, 15, 17, 29 and 30, and October 1, 6, and 8. As justification for not paying these requests for reimbursements, Walmart contended that Ms. LeBlanc's injuries to her back and neck were not causally related to her work accident.

The record shows that Walmart's justification prior to trial was because Ms. LeBlanc's initial complaints were of injuries to her left knee and shoulder, not her neck and back. Notwithstanding, after hearing testimony and reviewing the evidence, the original WCJ found, in oral reasons stated on the record in August 2013, that Ms. LeBlanc's neck and back injuries were causally related to her work accident. Despite that finding, when Ms. LeBlanc made demand in 2014 for mileage reimbursement for treatment she received after her original trial and before written judgment was forthcoming on February 19, 2015, Walmart continued its refusal to pay these reimbursement requests. Subsequently, Walmart would maintain that argument because it perfected a suspensive appeal of the 2015 judgment. Ultimately, however, this court rejected Walmart's argument as to causation and affirmed the WCJ judgment that found Ms. LeBlanc's neck and back injuries were related to her 2010 work accident.

40

On de novo review of the record and considering the provisions of La.R.S. 23:1201(F), we find that when Walmart denied the mileage reimbursement requests, at a time when no judgment had yet been signed, it relied on medical evidence to dispute the WCJ's finding that the neck and back injuries were related to the work accident. This argument would then form the basis for Walmart's suspensive appeal in 2015. Although we would later reject Walmart's argument and even though it may now be liable for the mileage reimbursement requests, we find that no penalties and attorney fees are due because the record supports that Walmart has reasonably controverted this claim.

*Denial of treatment and untimely payment of Dr. Hodges*

Ms. LeBlanc first argues that she is entitled to a penalty for Walmart's failure to authorize treatment by Dr. Hodges, a specialist in physical pain and rehabilitation, for treatment of her neck and back scheduled for June 5, 2014.

The record shows that the medical record for Ms. LeBlanc's initial visit with Dr. Hodges includes a history of her 2010 work accident which describes injuries to her shoulder and knee, injuries Walmart has always admitted as compensable. Nevertheless, Dr. Hodges's overall assessment and plan of treatment focuses on the cervical and lumbar regions. Shortly afterwards, on August 11, 2014, although Dr. Hodges noted that Ms. LeBlanc had restricted range of motion of the left shoulder, her major complaints were of aching and shooting pain radiating to the right leg, and Dr. Hodges noted that she returns with symptoms of neck and back pain.

Even though Walmart's refusal to authorize treatment appears after the original WCJ orally ruled that Ms. LeBlanc's neck and back pain was related to the work accident, it is equally clear that such finding would not be reduced to judgment until the first months of 2015. Moreover, once the judgment was signed, Walmart suspensively appealed that judgment.

Against that factual background, we find that when Ms. LeBlanc first sought this treatment, Walmart had reasonably controverted the claim of causation for the back and neck injuries, and it maintained that argument throughout the appellate process.

Ms. LeBlanc next contends that she is entitled to a $2,000.00 penalty because Walmart paid Dr. Hodges more than sixty days after the bill was sent. *See* La.R.S. 23:1201(E)(1). The record shows that Walmart paid Dr. Hodges on January 28, 2016, February 29, 2016, and March 23, 2016. Ms. LeBlanc has failed to direct us to record evidence which would establish when the sixty-day period would have begun. In the absence of that, we find no merit to her contention.

In further argument, Ms. LeBlanc contends that if the sixty-day payment window commenced on December 4, 2015, the date the appellate court decision became final, Walmart's payments to Dr. Hodges which culminated on March 23, 2016,[18] were untimely under the provisions of La.R.S. 23:1201(E)(1).

From the outset, we observe that Dr. Hodges's involvement in Ms. LeBlanc's medical treatment commenced after the original hearing on her workers' compensation claim. As a result, no aspect of his treatment and the cost associated with that are encompassed in the judgment of December 4, 2015. We find, as did the original WCJ, that Walmart reasonably controverted the claim of causation for the neck and back injuries, the basis of the medical treatment Dr. Hodges provided during that period. Thus, we find no merit to Ms. LeBlanc's argument that a penalty is due for this claim.

*Denial of the medically recommended FCE*

---

[18] Although our review shows that the payment on February 29, 2016, would also have been untimely, Ms. LeBlanc has not also included that date in her argument.

42

Ms. LeBlanc contends that although an FCE was ultimately authorized and conducted on May 16, 2018, Walmart denied her request dated August 21, 2017, to order an FCE that Dr. Broussard, the independent medical examiner, did not oppose on September 15, 2015, and Orthopedic and Sports Physical Therapy ("OSPT") recommended on August 17, 2017. Accordingly, she asks that a penalty and attorney fees be imposed.

In *Authement v. Shappert Engineering*, 02-1631, p. 11 (La. 2/25/03), 840 So.2d 1181, 1188 (emphasis added), the supreme court instructed:

> As stated in *Williams v. Rush Masonry, Inc.,* 98-2271 (La. 6/29/99), 737 So.2d 41, 46, awards of penalties and attorney fees in workers' compensation cases are essentially penal in nature. The purpose of imposition of penalties and attorney fees is to discourage indifference and undesirable conduct by employers and insurers. The crucial inquiry in **determining whether to impose penalties and attorney fees on an employer is whether the employer had an articulable and objective reason to deny benefits at the time it took action.**

From the outset, we note that although Dr. Broussard did not oppose an FCE in 2015, Ms. LeBlanc did not urge such action until 2018, almost two years later. We also observe that OSPT's recommendation was made after noting that Ms. LeBlanc had SPS. At that time, Walmart, relying on Dr. Lutz's medical report, contested that the SPS was the result of Ms. LeBlanc's work accident. The record supports that Walmart reasonably controverted the claim for FCE. Thus, we find that no penalty and attorney fee are due.

### SUMMARY: PENALTIES AND ATTORNEY FEES

*Attorney fees: Penalty Setting*

As provided in La.R.S. 23:1201(G), any award payable under the terms of a final, nonappealable judgment not paid within thirty days after it becomes due subjects the employer to a penalty not to exceed $3,000.00 and reasonable attorney fees if the nonpayment resulted from conditions over which it had control. Earlier,

43

we found Walmart made untimely payment of Dr. Heard's medical billings ordered by a final judgment, and it alone had control of payment.

The underlying reason for the Workers' Compensation statutes in allowing the imposition of penalties and attorney fees for the withholding of benefits is to combat indifference by employers and insurers toward injured employees. *Hood v. C.J. Rogers, Inc.*, 94-1162 (La.App. 3 Cir. 3/8/95), 654 So.2d 371. Penalty and attorney fee provisions of the Workers' Compensation Act are specifically designed to deter employers and their insurers from unjustified failure to alleviate suffering of workers injured in their employment. *Thibodeaux v. L.S. Womack, Inc.*, 94-1375 (La.App. 3 Cir. 4/5/95), 653 So.2d 123.

The only limitation on the amount of attorney fees in the penalty setting is that it should be reasonable. La.R.S. 23:1201. The restriction on attorney fees embodied in La.R.S. 23:1141(B), discussed later, that may be charged as to the recovery of the benefits themselves is inapplicable here.

We found Walmart liable for its untimely payment to Dr. Heard and ordered it to pay a penalty of $3,000.00 and an attorney fee of $5,000.00. We further find that Walmart owes legal interest on the penalty and attorney fee awards from the date of judgment. *See Sharbono v. Steve Lang & Son Loggers*, 97-110 (La. 7/1/97), 696 So.2d 1382; *Day v. Superior Derrick Servs.*, 11-749 (La.App. 3 Cir. 12/7/11), 80 So.3d 654.

*Attorney fees: Recovery of benefits*

The fees of an attorney who renders service for an employee in a workers' compensation controversy are limited to twenty percent of the amount of benefits recovered. *See* La.R.S. 23:1141(B). The fees must be reviewed and approved by the WCJ and are to be paid from the amount awarded to the plaintiff/claimant in the manner prescribed by the WCJ. *See* La.R.S. 23:1141(A); *see also* La.R.S. 23:1143.

It is well-settled that the amount of attorney fees due an attorney for representation in a workers' compensation matter is based on the attorney's time, skill, and effort to recover the benefits owed. *Miller v. Gaspard*, 95-861 (La.App. 3 Cir. 12/6/95), 664 So.2d 810. Moreover, it is well settled that a determination of an attorney's compensation under this analysis is necessarily predicated upon a thorough evaluation of the record facts and application of the criteria set forth under Rule 1.5 of the Louisiana Rules of Professional Conduct. *Id.*

Louisiana Rules of Professional Conduct, Rule 1.5(a) provides, in pertinent part, as follows:

> The factors to be considered in determining the reasonableness of a fee include the following:
>
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.

In the present case, the WCJ never reached the question of whether attorney fees were due because it did not find Ms. LeBlanc's SPS was causally related to the work accident and, thus, was not compensable. As stated above, on de novo review

45

we have found that Ms. LeBlanc's SPS was causally related to the work accident. Accordingly, the issue of attorney fees comes into play.

Counsel for Ms. LeBlanc has introduced an affidavit itemizing 258 hours spent through the time of the last trial date and expenses in the sum of $10,997.75. Because we find it necessary to remand this matter to the WCJ to address Ms. LeBlanc's claim for permanent and total disability and her request for the payment of Dr. Heard's billings incurred after the conclusion of the first trial to date, counsel for Ms. LeBlanc will devote additional hours of representation. Accordingly, we find it most efficient to refer Ms. LeBlanc's request for attorney fees for the recovery of benefits to the WCJ along with her claim for permanent and total disability and Dr. Heard's latest medical billings.

Notwithstanding, Ms. LeBlanc's attorney has requested attorney fees for work done on appeal. For work done on the appellate level, we award Ms. LeBlanc's attorney $5,000.00.

## DECREE

For the foregoing reasons:

**IT IS ORDERED, ADJUDGED, AND DECREED** that the judgment of the Workers' Compensation judge which found that Mona LeBlanc's stiff person syndrome was not related to the work accident of November 2, 2010, is reversed and set aside.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the judgment of the Workers' Compensation Judge which found Mona LeBlanc capable of engaging in gainful employment in a sedentary capacity and which granted Walmart Stores, Inc.'s motion to modify judgment is reversed and set aside.

46

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that those portions of the Workers' Compensation Judge's judgment which denied penalties and attorney fees are affirmed in all respects but one, namely, the untimely payment to Dr. Michael E. Heard of outstanding medical payments after our judgment of November 14, 2015, became final.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that for its untimely payment of the outstanding medical billings due to Dr. Michael E. Heard after our judgment of November 14, 2015, became final, Walmart Stores, Inc. is required to pay Mona LeBlanc a penalty of $3,000.00 and an attorney fee of $5,000.00, together with legal interest on the penalty and attorney fee award from the date of judgment.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that for legal work done by counsel for Mona LeBlanc on this appeal, we award her an attorney fee of $5,000.00.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this matter is remanded to the Workers' Compensation Judge to address Mona LeBlanc's motion to modify the judgment of February 19, 2015, to increase her disability from temporary and total disability to permanent and total disability. In doing so, the Workers' Compensation Judge is to entertain updated information on Mona LeBlanc's physical limitations, as well as her medical condition since the time of her last hearing in the trial court. Furthermore, the Workers' Compensation Judge is instructed to consider Mona LeBlanc's request for the payment of Dr. Michael E. Heard's medical billings, determine those sums and other like charges from his office that have occurred subsequently, address whether Dr. Michael E. Heard's treatment as reflected in those medical billings was reasonable and necessary, and

make an award accordingly.  On remand, the Workers' Compensation Judge is further instructed to determine Mona LeBlanc's counsel's request for attorney fees for the recovery of benefits sought at the trial level.

The costs of this appeal are assessed one-half to Walmart Stores, Inc. and one-half to Mona LeBlanc.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED WITH INSTRUCTIONS; AND JUDGMENT RENDERED.**